Good morning, Your Honors. May it please the Court, my name is Jonathan Steiner, and I represent the appellants in this case. Your Honors, there are two issues before the Court in this case. The first is the disallowance of the deduction of professional fees. The second is the disallowance of the deduction of the net operating loss and the effect of that disallowance of that net operating loss. And it's that second point that I'd like to focus on first. And it's the appellant's contention that the tax court gravely erred in failing to follow uncontradicted, unrebutted, clear evidence, both in the form of documents and testimony regarding the reporting of income, $12.9 million of income, during the years 1995 through 2001. And specifically as to the years that were docketed in this case, there's one year in particular, which is 1998, where there was testimony of the CPA who had prepared the tax returns for the corporation and who was familiar with their books and records regarding the fact that this additional income had been reported to cover the shifting of income theory that was propounded by the appellant's, Mr. Bulwer's attorney, to report this additional income and that that income got on the books and records of the corporation and was reported in the tax returns. Now, that income was reported because of this income shifting theory. And so when the net operating loss was disallowed, that meant that this additional income in these, what we're calling the amortization adjustments, that the taxpayer was entitled to credit for that income that was reported. And that was an important part of our case that we presented. And it received what I'd call sort of short shrift in the tax court's opinion. There was a footnote on it. We brought it up in motion for reconsideration, and it was rejected at that point, too. It didn't receive a lot of attention, in fact, even in the appellee's brief. But we submit that even though it was a finding of fact, that in this case, there was uncontradicted testimony from a neutral witness regarding the. Neutral? Neutral? Which witness are you referring to as neutral? I'm referring to Alan Kobayashi. He's the CPA of the, not, he's not an employee of the corporation. He's a partner in a well-reputable CPA accounting firm here in Honolulu, and he's been familiar with the corporation's tax returns over time. And, sure, he has an interest in keeping them as a client, but he's also got ethical obligations that he has to follow as a CPA. And in this case, he testified that, sure, he found it was strange that the taxpayer was reporting this additional income. And he also testified, as appellees pointed out, that maybe he didn't quite understand the net operating loss, and he trusted attorneys Sciatani as well as Suzuki as far as the genesis of that. But what he specifically knew about and testified as to was that he looked at these accounting entries, he saw the handwriting of the controller, Mr. Chong, that these had been put into the books, and he explained that these accounting entries did record this income on the books and records of the corporation and that this income was reported on the tax returns. And the IRS recognized that if it disallowed these net operating loss, that it had to give them credit for this additional income that was reported with respect to the tax returns. And it recognized that for a couple of years, but it didn't recognize it for 1998. And so at the trial, we presented evidence that in 1998, there was more of this income that had been reported and these amortization adjustments in order to cover this. Counsel, how much are we talking about? For the year 1998, we're talking about $4.2 million, a significant amount. And does that figure have any independent documentation in the – I know it was reported. Do you have any documentation that that is actually what the company – that was actually how much the company thought they were owed under these tobacco taxes? Or is that just a figure that the CEO made up? There was some evidence that the CEO was simply going over and directing his own accountants to write down a figure and say that's how much we were owed. We don't have evidence that matches up precisely. You can document the $4.2 from the tax forms. You can't document the $4.2 million that you took off the business records. Is that correct? I'm not sure I followed that. You can document that this $4.2 million in 1998 was reported to cover tobacco taxes that were reported in earlier years. So when the tax court found that those were reportable in the earlier years, it meant that in these later years that that income did not have to be reported. But what I think Judge Fibey is getting at is during the earlier years where this net operating loss – I'll call those just the earlier years, and then I think we understand clearly the carry-forward issue and the amortization years, I'll call them that, that there was evidence that those were pretty arbitrary numbers. And so that's what I'm interested in hearing about. Where did those numbers come from that wound up on the tax return? I would say that there was not evidence that they were arbitrary numbers. It wasn't proven in the case below. But I want to remind the Court that in this case, for these earlier years, the IRS never examined and did a revenue agent's report for the years 1989 through 1994. Right, but getting back to Judge Fibey's question, Counsel, I'm using the word arbitrary. Maybe you want to use a different word. But I'm trying to focus on the testimony, as I think Judge Fibey was, about the CEO directing on a month-to-month basis a number for the NOL, and I'm trying to figure out where's the documentation that backs up where those numbers came from. Well, even assuming that there isn't that documentation. Is there? Was it in the record? It's not in the record. There is no proof in the record. There is some evidence regarding the way that those numbers came up, but there is no precise breakdown between how much of those numbers relate to the recoupment of tobacco tax versus what were called the off-book activities of Mr. Boulware. But I would submit that that doesn't matter, because that was income that was reportable during the years 1989 through 1994, not the docketed years. So in the docketed years, once you find that that income is reportable in those early years, well, there may be an issue as to those years, but those years are not before the court. And the net operating loss that was disallowed was, I think, $2.5 million. We're talking $4.2 million of income that was reported in these later years, that there was uncontradicted evidence that it was reported. The counsel for the IRS was asked, are you going to put on any evidence to show that this income didn't get onto the books and records? And they said no. Our argument is that it was subsumed within this net operating loss carry-forward. And that's true. It was subsumed. But once you take away the net operating loss carry-forward, that means that as they did with 1999, 2000, and 2001, where there was a credit, you had to give a credit for 1998 as well, because that was the same kind of income. What about the finding that the witnesses weren't credible? There is a general finding. There was a lot of witnesses in this case, and there was a general finding saying we find certain witnesses were credible and certain witnesses were not credible. But we would submit that that's simply not enough in this case to support the rejection of testimony which was backed up with documentary evidence and which was unimpeached on cross-examination. And, in fact, the Demkowitz case, I think, is right on point, because in that case the court found that the tax court in that case says we don't believe that the loan at issue in that case, we just don't believe that it was used for his personal purposes. And the court said, well, there was uncontradicted evidence to that effect, and unless it was specifically rejected, and I'm quoting here, they say that it's enough to meet the ultimate burden of persuasion unless it was specifically rejected by the tax court as being improbable, unreasonable, or questionable. So which witnesses' testimony do you need to rely on in order to establish this point? The primary witness is Alan Kobayashi's testimony, who has to be relied upon. Anybody else? Well… Are you going to have to rely on Mr. Bulwer's testimony? No. You don't have to rely on Mr. Bulwer's testimony, and he didn't testify about it. He may have testified a little bit about it, but you don't need to rely on his testimony or need to look at Mr. Kobayashi's testimony, because he's the one who specifically testified. And I don't have the list in front of me. Did the tax court find that Mr. Kobayashi was credible or not credible? He listed him. He said, I find the following witnesses, and he listed a whole bunch as credible. Then he said the rest of the witnesses' testimony was either unhelpful or not credible. Didn't specifically mention Mr. Kobayashi, but he did mention, just to be complete and not to mislead the court, he did at one point say that Mr. Kobayashi was a pawn for the schemes, what he called the schemes of Mr. Shiatani and Mr. Suzuki, but that was in… I didn't follow your answer, and I just want to clarify. Go ahead. In the list, and I don't remember this either, but in the list of witnesses, credible, the rest not credible, which list was Mr. Kobayashi in? There's a list of ones they said were credible. And he's not on that list? He's not on that list. Okay. And then there's these other witnesses where he says either their testimony was not credible or unhelpful, but he doesn't specifically address. And I would just submit that… Does he have to? If there are 50 witnesses and he said, I believed four of them and the rest of them are liars, do they have to list the others? He didn't have to list the others, but in this specific instance where this is so, this critical issue, he had to discuss and say, even though Mr. Kobayashi testified that he looked at the books and records in this guy, we find that that's not a credible because. Why does he have to? Why do they have to do that? I think he does in this case because it was uncontradicted testimony, and if you look at the cases… Is there some rule you're aware of that says that a person whose testimony is not directly contradicted must be believed or must be believed unless there's a laundry list of specific reasons not to believe them? Yes, Your Honor, there is. In the tax court context? Yes, in the Demkowitz v. Commissioner case. It's a Third Circuit case, admittedly not the Ninth Circuit, but there are also Ninth Circuit cases that follow the same logic. In that case, the court found that where there was, and this is important because the tax court is the fact finder in this case, and they hear a lot of, and they're like a jury, but they're the fact finder and they have to put out findings of fact, conclusions of law. Well, they did. And they did ad nauseum, but this was a critical part of our case, and it gets a footnote. Counsel, can you tell us what pages of the tax court's opinion that you're disputing where all of this occurs? I want to know which pages of the tax court's opinion are the ones that you're contesting right now and that you think are in error. I think that in the tax court's opinion, it's the opinion at page 166. And that's the tax court's own numbering? I believe so. I'm looking for the excerpts of records. I don't need the excerpts of records. I'd rather have the tax court opinion side. That's all. Okay. That's where they talk about it. And they mischaracterize it. They say two things. They say it didn't include any offsetting credit to any income account of HIE. And if you read our briefs, we demonstrate that, yes, there was a credit. And then he says, and the effect of that was to the adjustments reported, HIE's income tax expense and the amount of tax that was actually paid. Tax expense. Tobacco tax expense to the amount of tobacco tax that was actually paid. Well, that's clearly an error because the tobacco tax recoupment were in the earlier. So we've got two errors there in the rationale for rejecting Mr. Kobayashi's testimony, weighted against the fact that it was uncontradicted testimony, that if you look at the sites that we provided, the government didn't even really contest this. They just said, well, Mr. Kobayashi didn't know what he was doing. Well, even if Mr. Kobayashi didn't know what he was doing, he reported this additional income. And if you think that this whole income shifting was a scheme to keep Mr. Booler out of jail, which we dispute, but that's what the tax court found, well, once you shift it back, they have to get credit for that additional time. Thank you, counsel. We used some of your time with questions, so you may have a minute for rebuttal when the time comes. May it please the Court. Patrick Gerda for the Commissioner of Internal Revenue. Your Honors, the tax court correctly found that taxpayers could not deduct Mr. Booler's professional fees or, as this Court focused on in the argument before me, the alleged net operating loss. I'd like to begin with talking about the net operating loss and, first of all, clear a few things up. The Third Circuit case relied on Demkowitz expressly holds that the tax court, quote, is not bound to accept taxpayers' uncontradicted testimony if it found the testimony to be improbable, unreasonable, or questionable. And here, that's precisely what happened with Mr. Kobayashi. Although Mr. Kobayashi was not called out by name as one of the explicitly incredible witnesses, in page 155, note 42 of the tax court's opinion, he was noted as a mere pawn for Michael Boulware and accepted Mr. Boulware's representations at face value. Mr. Boulware, of course, was one of those witnesses found to be incredible. So the tax court was under no obligation to listen to Mr. Kobayashi. And, moreover, Mr. Kobayashi's theories were based on Suzuki and Shiatani and their theories. Again, the tax court found that Suzuki and Shiatani were totally incredible. I wonder, counsel, if the language you're quoting about finding this particular witness who allegedly added the income back in, the characterization of him as a pawn could be interpreted to mean that he did it, he didn't know why he was doing it, but he just took orders and did it. If that were the case, wouldn't opposing counsel have some more merit to his argument? I think that there's – it's an interesting argument, but I don't think so, Your Honor. And the reason is this. The taxpayers actually have to substantiate the income. As Judge Bybee pointed out, there is no documentation whatsoever which tells us where this income came from. But those were the years that weren't audited. That's right. Well, actually, in 1998, that is an audited year, certainly. Well, it's almost – it almost begs the question, doesn't it? Because I think the evidence was, as I understand it, is that these numbers came – your position was that they came out of error on a month-to-month basis by the CEO, if I could use that term colloquially. And so my question is, if that happened and then Mr. Kobayashi got these numbers and didn't ask where they come from but plugged them back in, then what should I do with that? Well, I think that you're still left with a credibility determination, which the task force has already made. It all is contingent on believing that the numbers, the NOL numbers, were actually put in there at the beginning and then believing that when Mr. Kobayashi put in numbers at the directions of Suzuki and Shiatani and not knowing what those numbers related to, that they actually related to this. Because remember, just because that there's income reported doesn't mean that that income was over-reported. And that's the key part of this case. Here, the taxpayer has already conceded that the net operating loss income shift theory was incorrect. They're no longer challenging the tax court on that. So they basically shifted to this, that we over-reported, we the taxpayers, over-reported $4 million in 1998 pursuant to this theory, which makes no sense. So the question is whether that $4 million was actually related to that theory or it was just $4 million of income. And that's where taxpayers have to actually substantiate and show documentation, and that the taxpayers did not do. Instead, they put on the stand Mr. Kobayashi, who was a mere pawn and said, yeah, I did this. I don't know why I did it. Suzuki and Shiatani told me that's what it related to, but that's not good enough. You actually have to substantiate. And of course, given the tax court's credibility findings, they failed to substantiate. I'd also like to note that, of course, the normal way we recover over-reported income is a tax refund suit. And that's how we do this. Once again, a taxpayer like HIE would need to substantiate and show in a tax refund suit that that $4 million actually came from a ground that they could recover. That's something, again, that wasn't before the tax court. And the tax court didn't see anything because, quite frankly, the entries were confusing, as a witness testified. And really, it all stemmed from Suzuki and Shiatani. Now, moving over to the professional fees issues, a taxpayer generally cannot deduct another's professional fees or another's expenses because it's not connected with the trade or business. Though, if it is directly connected with the taxpayer's own trade or business, the taxpayer certainly can. There are three or four circuits that have adopted expressly the tax court's two-part test. Is that what you're urging this court to do as well, to adopt that test? Well, I think that that test makes a lot of sense based on this court's previous precedent, interpreting the ordinary and necessary business expense, for example, in the inland asphalt case. Basically, the two-part test is merely a spinning out of that in a particular situation, the situation where I'm paying for another's expenses. And it makes sense. The two parts are what? First, that there is actually a business motive. I'm not just paying. I'm paying primarily to benefit my own business. And secondly, that the origin of the claim arises out of my business. And, of course, that's just the baseline test. So the ordinary and necessary business expense is really, which is just the normal question, is really step two in the tax court's analysis. And the one kind of interesting overlay is just that when you're paying somebody else's expenses, you have to also have a business purpose. Of course, just because you have a business purpose doesn't mean that you've satisfied step two, which is the normal question, does this arise? Right. Exactly. And here, the criminal charges did not satisfy either step one or step two. The business purpose for HIE is unclear, but the benefit, which is, of course, how the First Circuit and how the tax court really looks at this, who gets the benefit, really went to Mr. Boulware. Mr. Boulware was defended from his criminal charges, personal criminal charges, tax evasion. And the question is, on step two, were these ordinary and necessary to the corporations? Did they arise in connection with corporate activities? On that question, it's a resounding no. This was Mr. Boulware's own decision not to report certain income. It doesn't matter where the income came from. What matters is Mr. Boulware chose not to report the full amount of the income that he earned or he took. And I know that there is also some issue regarding the Boulware v. Lee case and the professional expenses there. However, taxpayers only mention this in a footnote on their appellate brief. So unless the court has any questions about that argument, it really pretty much tracks the criminal case as well. So if there are no further questions. I don't believe so. Thank you. Thank you. Mr. Steiner, you may have one minute for rebuttal. Just a couple things really quickly, because I know I don't have much time. Mr. Orta mentioned that we have a duty to substantiate the income. I'm talking the 1998 income moat. And there was no evidence put on by anybody to say that this income was anything other than to cover this income shifting, these amortization adjustments. And he said it could have been for something else. Yeah, except this record is just replete from top to bottom with the theft by Mr. Boulware. He was making stuff up. He was creating dummy corporations. He was looting the company from top to bottom. And there is evidence that he was telling the accountants what numbers to write down and just making them up out of thin air. There's quite a bit of evidence there. And I don't think the government is out of line to say, well, maybe we ought to have some proof that when you wrote these numbers down and claimed them that you actually had something to back it up. Well, Your Honor, a couple of points on there. Number one, Mr. Boulware went to jail for the years 1998 through 1997. The entries at issue here are after he was investigated and convicted. And the idea of what he was doing went much earlier than that. He'd been looting this company for a long time. He was convicted of doing that. And we dispute, even though that conviction has been affirmed. But he's paid the price for that. These entries were in the nature of making up for that. He wanted to make sure he reported additional income in these later years. And maybe it was to provide a defense for these earlier years. But he reported that income. And the idea that it could have been for something else. Well, if you look at the entries themselves, there's a $1.8 million entry decreasing costs of goods sold. How could that be something else? And it was testified. This is the way we did it. We decreased costs of goods sold to report this additional income. So I think that the idea that we had to show that these couldn't have been something else. Well, that would be proving a negative. These were entries that said, hey, go ahead and report a lot of extra income to cover this shifting of income. We'd have to prove a negative to disprove that. Thank you, counsel. Your time has expired. Can I just mention one thing on the legal fees, which is that in all the argument, no mention was ever made of the indemnification. And I think under this circumstance, there was an obligation to indemnify Mr. Boulware. And it was Monday morning quarterbacking by the tax court to say, hey, now that he's convicted, all these activities had to do with him looting the corporation. And, therefore, it was improper for the corporation to indemnify him pursuant to these indemnity obligations. Thank you, counsel. Thank you. We appreciate the arguments of both counsel. It's been very helpful. The case is submitted.
judges: Graber, Bybee, Christen